Filed 9/14/23  P. v. Frazier CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D080220 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD289037) |
| MARTEL MIGUEL FRAZIER, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Aaron H. Katz, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found Martel Miguel Frazier guilty of human trafficking, pimping, and pandering of a minor. The trial court found true that Frazier had suffered a prior strike under the Three Strikes law. Frazier, who is Black, submitted sentencing briefs in which he offered statistics showing that over a 10-year period, more Black people than members of other races were arrested for human trafficking of minors, and/or pimping and pandering of victims of any age. He also claimed Black defendants tended to receive more severe punishment for these offenses than members of other races.

Based on this asserted data, Frazier claimed a violation of Penal Code[1] section 745, a provision within the recently enacted California Racial Justice Act of 2020 (RJA), which prohibits the state from seeking or obtaining a criminal conviction or sentence on the basis of race. As a remedy for the alleged RJA violation, he asked the trial court to dismiss the strike allegation under section 1385, former subdivision (c)(3)(A) (now subdivision (c)(2)(A)), and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*), or alternatively to impose a low-term sentence.

The trial court declined to do so. It found Frazier had failed to make a prima facie showing of an RJA violation, in that he failed to satisfy the statutory requirement of showing the defendants assertedly receiving more lenient treatment were similarly situated to him. (See § 745, subd. (a)(3), (4)(A).) On appeal, Frazier fails to establish the court's ruling was erroneous. As a consequence, we affirm the judgment.

---

[1]     Further unspecified statutory references are to the Penal Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Trial Evidence and Verdict*

In February 2018, a San Diego police officer assigned to the Department of Justice Human Trafficking Task Force learned the services of a 17-year-old prostitute (Jane Doe or minor) were being offered in a commercial advertisement posted on a website commonly used to advertise prostitution. The officer, posing as a sex buyer, texted the phone number in the advertisement and arranged for the minor to meet at a hotel and engage in certain sex acts for an agreed price.

At the appointed time, the minor arrived at the hotel in a car driven by 29-year-old Frazier. Frazier remained in the car as the minor exited and made her way to the hotel room, where police officers were waiting. The officers detained the minor and arrested Frazier.

A box of condoms was discovered in Frazier's car. Two months' worth of text messages between the minor and Frazier were extracted from the minor's cellphone. The topics included arranging meetings with sex customers, what sex acts the minor could perform, finding customers' locations, the minor's need for condoms, and collecting money from customers. An expert in human trafficking testified the messages were consistent with pimping, pandering, and human trafficking activity.

A jury convicted Frazier on charges of human trafficking of a victim under 18 years old (§ 236.1, subd. (c)(1); count 1), pimping of Jane Doe (§ 266h, subd. (a); count 2), and pandering of Jane Doe (§ 266i, subd. (a)(1); count 3). It further found in connection with counts 2 and 3 that Jane Doe was a minor 16 years of age or older. (§§ 266h, subd. (b)(1), 266i, subd. (b)(1).) In a bifurcated proceeding, the trial court found true that

3

Frazier had suffered a prior robbery conviction (§ 211) that qualified as a strike within the meaning of section 667, subdivisions (b) through (i).

## II.

### *Sentencing*

A.    *Frazier's Sentencing Briefs*

In advance of the March 2022 sentencing hearing, Frazier filed a sentencing memorandum and a corresponding addendum in which he requested sentencing leniency.  He asked the trial court to dismiss the strike allegation, or alternatively to impose the low term of three years (doubled by the strike) for a sentence of six years.

In moving to dismiss the strike allegation, Frazier relied on section 1385, subdivision (c), which was added to section 1385 effective January 1, 2022.  (Stats. 2021, ch. 721, § 1.)  Subdivision (c) of section 1385 requires sentencing courts to "dismiss *an enhancement* if it is in the furtherance of justice to do so" and would not endanger public safety.[2]  (§ 1385, subd. (c)(1), italics added; *id.*, subd. (c)(2).)  It provides a list of nine mitigating circumstances for the court to consider when exercising its discretion to dismiss enhancements.  (*Id.*, subd. (c)(2)(A)–(I).)[3]  The first of those

---

[2]    As we later discuss, the parties agree section 1385, subdivision (c), does not authorize a sentencing court to dismiss a strike allegation.  We will assume this is correct without deciding so.

[3]    As of June 30, 2022, the provision in section 1385 that lists the mitigating circumstances was renumbered from subdivision (c)(3) to (c)(2). (Stats. 2022, ch. 58, § 15 [deleting former subdivision (c)(2) and renumbering former subdivision (c)(3) as subdivision (c)(2)].)  Although Frazier's sentencing took place before the renumbering became effective, to avoid confusion we refer to the relevant provision that sets forth the mitigating circumstances using its current designation of subdivision (c)(2).

4

mitigating circumstances is whether "[a]pplication of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745." (*Id.*, subd. (c)(2)(A).)

Section 745, in turn, was added to the Penal Code by enactment of the RJA, which became effective January 1, 2021.[4] (Stats. 2020, ch. 317, § 3.5.)

---

The other eight mitigating circumstances are whether multiple enhancements are alleged in a single case; application of an enhancement could result in a sentence of over 20 years; the "current offense is connected to mental illness"; the "current offense is connected to prior victimization or childhood trauma"; the "current offense is not a violent felony as defined in subdivision (c) of [s]ection 667.5"; the "defendant was a juvenile when they committed the current offense or any prior offenses . . . that trigger the enhancement or enhancements applied in the current case"; the "enhancement is based on a prior conviction that is over five years old"; and "[t]hough a firearm was used in the current offense, it was inoperable or unloaded." (§ 1385, subd. (c)(2)(B)–(I) & (c)(4).)

The statute provides that "[p]roof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

[4] After Frazier filed his opening brief on appeal, the Legislature enacted certain amendments to the RJA that became effective January 1, 2023. (Stats. 2022, ch. 739, § 2.) The parties agree these amendments do not substantively affect Frazier's case and should not be applied retroactively to Frazier. The amendments did not alter the text of subdivisions (a)(4)(A) or (h)(2) of section 745, two of the provisions relevant to Frazier's appeal. (See Stats. 2022, ch. 739, § 2.) Although the amendments did alter the text of subdivision (a)(3) of section 745 by substituting the phrase "who commit similar offenses" with the phrase "have engaged in similar conduct" (see Stats. 2022, ch. 739, § 2), this modification does not affect our analysis of the adequacy of Frazier's prima facie showing of an RJA violation. Because this appeal does not require us to consider whether the recent amendments of the RJA should be given retroactive effect or to apply the statute in its current

Subdivision (a)(4) of section 745—the provision cited in subdivision (c)(2)(A) of section 1385, prohibits racial discrimination in *sentencing*. (See § 745, subd. (a)(4)(A) & (B); *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147–148 & 148, fn. 4 (*Young*).) Relevant here, subdivision (a)(4)(A) of section 745 establishes that the RJA is violated when a longer or more severe sentence is imposed based on the race of the defendant. More specifically, it provides that a violation of the RJA "is established if the defendant proves, by a preponderance of the evidence" that "[a] longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed."[5] (§ 745, subd. (a)(4)(A).)

In moving to dismiss the strike allegation pursuant to section 1385, subdivision (c), Frazier sought in part to establish the mitigating circumstance that "[a]pplication of the enhancement would result in a

---

form, and because the parties rely on the text of the RJA as originally enacted, all of our references to the statutes comprising the RJA are to the former versions of the statutes unless otherwise stated.

[5] Subdivision (a)(4)(B) of section 745 establishes that the RJA is violated when a longer or more severe sentence is imposed based on the race of the victim, and is not at issue here. (See § 745, subd. (a)(4)(B) ["A longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for the same offense on defendants in cases with victims of one race, ethnicity, or national origin than in cases with victims of other races, ethnicities, or national origins, in the county where the sentence was imposed."].)

discriminatory racial impact as described in" subdivision (a)(4) of section 745, among other enumerated mitigating factors.  (§ 1385, subd. (c)(2)(A).)  In support of this part of his motion, he offered statistics he obtained from the San Diego County District Attorney's Office in response to a Public Records Act request.[6]

According to Frazier's interpretation of the District Attorney's statistics,[7] they revealed that during a 10-year period from January 1, 2012 to January 1, 2022,[8] Black people "have been more likely prosecuted" than "White, Hispanic, and other[ ] (Asian, Guatemalan, Vietnamese)" people for "prostitution crimes."  Frazier defined "prostitution crimes" to mean human trafficking in violation of section 236.1, subdivision (c)(1) (the provision that proscribes human trafficking of a minor); pimping in violation of section

---

[6]    Our ability to summarize Frazier's arguments accurately is made difficult by a lack of precision in his citations to the relevant provisions of section 745 (e.g., he cited to section "745(a)(b)(4)," which does not exist) and mathematical inconsistences in his descriptions of the statistics (e.g., he initially stated 254 Black people were *arrested* for "prostitution crimes" but later stated that 254 Black people were *prosecuted* for them, and even later stated *245* Black people had been arrested, of whom 251 were "charged and sentenced" while "14 were dismissed").  These errors, however, are not outcome-determinative of this appeal.

[7]    Although the statistics were produced to the defense on an Excel spreadsheet, the spreadsheet and the raw data it contained were not provided to the trial court and are not part of the record on appeal.  In his sentencing memorandum, Frazier explained he omitted "many entries on the Excel sheet" regarding "prostitution arrests" from "the defense counting of the statistics" for various reasons, including that "some entries" purportedly contained "insufficient facts" as to the ultimate disposition of the case.

[8]    Elsewhere, Frazier framed the 10-year period as "1/11/2012[ ] to 12/13/21."

266h, subdivision (a); or pandering in violation of section 266i, subdivision (a)(2). Unlike the current offenses for which Frazier was convicted, the pimping and pandering offenses he included in his statistics did not necessarily involve crimes against minor victims.

Frazier contended that in this 10-year period, 254 Black people were *prosecuted* for one or more of the identified prostitution crimes, compared to 10 White people, 13 Hispanic people, and 3 others ("Asian/Vietnamese") who were prosecuted for prostitution. He further stated that although "Black [p]eople make up 6.4% of the City of San Diego, and 5.5% of the County of San Diego,"[9] "Black [p]eople make up 91% of people prosecuted for prostitution crimes in San Diego County." By comparison, he stated, "White [p]eople make up 3%," "Hispanic [p]eople make up 5%," and "[o]thers[ ] make up approximately 1%" of those prosecuted for prostitution. As he put it, "[i]n simple English, if it looks like more [B]lacks are *arrested* than [W]hites and Hispanics there is a racial impact in the Black community." (Italics added.)

Frazier filed an addendum to his sentencing memorandum in which he purportedly set forth additional statistics in support of his claim of an RJA violation as a basis for the trial court to dismiss the strike allegation under section 1385, subdivision (c). In the addendum, Frazier emphasized *arrests* of people for the identified prosecution crimes in the same 10-year period. He stated that for this period, 254 Black people were *arrested* for prosecution

_____

9    Frazier cited the "United States Census Bureau, 2020" as the source of this information.

8

crimes, compared to "10 [W]hite [people], 13 Hispanic [people] and 3 others (Asian, Vietnamese etc.)."[10]

In a footnote within this addendum, Frazier added the following "comparison of prison sentences, sentences of probation and dismissals or rejections":[11]

- 251 Black people "were charged and sentenced," of which 172 or 68 percent were sentenced to prison and 59 or 23 percent were placed on probation. "The total arrested was 245," with 14 or 6 percent of those cases "dismissed or rejected."

- 12 White people were charged and sentenced, of which 7 or 58 percent were sentenced to prison and 5 or 42 percent were placed on probation. "The total arrested was 18," with 6 of those cases dismissed or rejected.

- 15 Hispanic people were charged and sentenced, of which 10 or 67 percent were sentenced to prison and 5 or 33 percent were placed on probation. "The total arrested was 16," with one of those cases dismissed or rejected.

- 34 "Black people were sentenced with strikes alleged and sentenced to 231 years, averaging approximately 6.8 years. Whites had no strike cases alleged along with the prostitution charges and there was one Hispanic case with an alleged strike."[12]

---

[10]    These are the same numbers he used to describe people *prosecuted* for prostitution crimes in the same 10-year period. It is unclear whether Frazier is referring to a different set of data or mischaracterizing the same data.

[11]    As with Frazier's original sentencing memorandum, the underlying data was not provided; he set forth the statistics within the text of the addendum.

[12]    As the People observe in their response brief on appeal, there are numerous calculation errors in the defense statistics. However, for the purposes of our analysis, we assume the statistics as described by the defense are generally accurate.

9

Based on his presentation, Frazier urged the court to "conclude [that] because [B]lack people are being prosecuted more often tha[n] others they experience a racial impact in their community[.]" He argued the statistics, as he interpreted them, "make clear the [identified] prostitution laws impact [B]lack people more frequently than other races, or groups" and moved the court to dismiss the strike allegation "based on the [r]acial [i]mpact of the law" as "described by section 1385, as it is defined [by section] 745(a)(4)." Alternatively, if the court denied his motion to dismiss the strike allegation, he argued consideration of this circumstance justified the court imposing the low term of three years on either count 2 (pimping, § 266h, subd. (a)) or count 3 (pandering, § 266i, subd. (a)(1)), doubled by the strike, for a total sentence of six years.[13]

B. *The People's Response to Frazier's Sentencing Briefs*

The People opposed Frazier's request to dismiss the strike allegation or to impose a low-term sentence. Addressing whether there were grounds for relief under section 1385, subdivision (c)(2), the People specifically disputed Frazier's claim of an RJA violation. They provided a seven-page table of information relating to 47 defendants charged with human trafficking, pimping, and pandering offenses. The table showed each defendant's race, charges in the latest criminal complaint, "guilty charges," disposition, and sentence.

---

[13] Frazier also argued other mitigating circumstances listed in subdivision (c)(2) of section 1385 supported dismissing the strike allegation, and alternatively moved the trial court to dismiss the strike allegation under its general authority to "order an action to be dismissed" under section 1385, subdivision (a), pursuant to *Romero, supra,* 13 Cal.4th at p. 504. As we later discuss, the court was not persuaded by these arguments. Frazier has not challenged these aspects of the trial court's sentencing decisions on appeal.

Although the information in the People's table was culled from the same set of statistics provided to Frazier, the People's focus was narrower than Frazier's. The People reviewed the criminal cases of 47 defendants "whose charged offenses" included human trafficking of a minor in violation of section 231.6, subdivision (c)(1); pimping of a minor in violation of section 266h, subdivision (b); and/or pandering of a minor in violation of section 266i, subdivision (b).[14] Thus, the cases analyzed by the People were limited to cases like Frazier's in which the defendant was charged with human trafficking, pimping, and/or pandering offenses involving a minor victim.

Summarizing its data, the People stated that of the 47 defendants charged with committing human trafficking, pimping, and/or pandering of a minor, 38 were Black, one was Filipino, three were Hispanic, and four were White. The last defendant's race was identified as "[o]ther." Sentencing for these 47 defendants included the following:

- The 38 Black defendants received sentences ranging from probation to 10 years, eight months in state prison, with a median sentence of four years and an average sentence of 4.3 years.

- The Filipino defendant was sentenced to five years in state prison.

- Two of the three Hispanic defendants were granted probation; the third was sentenced to three years in state prison.

---

14    Section 236.1, subdivision (c)(1), provides that "[a] person who causes, induces, or persuades, or attempts to cause, induce, or persuade, *a person who is a minor* at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section . . . 266h, [or] 266i, . . . is guilty of human trafficking." (Italics added.) Section 266h is the criminal statute that prohibits pimping; subdivision (b) applies when the person engaged in prostitution was a minor. Similarly, section 266i criminalizes pandering; subdivision (b) of this section applies where the person procured for prostitution is a minor.

11

- The four White defendants were sentenced to state prison for terms ranging from five to 12 years.

- The remaining defendant whose race was unidentified received six years, four months in state prison.

- There were six Black defendants, and one White defendant, charged with prior strikes.[15]

The People argued its statistics showed that for defendants whose charged offenses included human trafficking, pimping and/or pandering of a minor, the sentences they received had "absolutely nothing to do with their race." They further argued that Frazier's " 'similarly situated' analysis" was deficient in that there was no indication he had compared his background, offense conduct, or the strengths or weaknesses of the evidence in his case, with the backgrounds or cases of the defendants summarized in his statistics. As such, he had not demonstrated the discriminatory racial impact required to justify relief under section 1385, subdivision (c)(2)(A).

The People agreed that certain other mitigating factors in section 1385, subdivision (c)(2), were present.[16] They argued, however, that alleviating Frazier of the consequences of his strike would endanger public safety, a result that independently supported denying relief under section 1385, subdivision (c)(2). They pointed to the probation report, which stated

---

[15]    At the sentencing hearing, the prosecutor stated there were six defendants with alleged strikes, but our review of the data in the table shows the actual total was seven.

[16]    Specifically, the People agreed the mitigating factors under section 1385, subdivision (c)(2)(C) [application of an enhancement could result in a sentence of over 20 years), (F) [current offense is not a violent felony], and (H) [the enhancement is based on a prior conviction that is over five years old] were met.

Frazier's strike conviction arose from an incident in which he entered a motel room and told a prostitute to take a sex buyer's wallet while yelling at the prostitute to "get [Frazier's] gun" so he could keep the sex buyer from calling the police.

The People also submitted a new report from a detective who had listened to calls Frazier placed from jail while awaiting trial on his current offenses. According to the report, while in pretrial custody, Frazier had continued pimping, using the jail phone to give an 18-year-old prostitute various commands; had committed state unemployment fraud, collecting $10,000 in fraudulent payments; and had communicated with the minor victim of his current offenses in violation of a stay-away order.

The People argued this history, in addition to Frazier's current offense conduct of directing a 17-year-old minor to meet with sex buyers on 40 occasions over a two-month period, showed Frazier was dangerous and undeserving of sentencing leniency under section 1385, subdivisions (a) or (c), or *Romero*. They also opposed a low-term sentence on the ground that aggravating sentencing factors outweighed any circumstances in mitigation.

C. *Sentencing Hearing*

At the sentencing hearing, defense counsel noted that although the People's statistics were focused on defendants who were charged with "the exact crimes of which Mr. Frazier was convicted," he argued "the statistics are pretty much the same" and show "a great many more [B]lack people were arrested than [W]hite people." However, counsel acknowledged he could not "say why [B]lack people are arrested more and sentenced longer" but stated "the statistics show that they are." He argued "the purpose of the law" is "to see if there [is] a racial impact," and "they send you to another code outside of [section] 1385 to [section] 745(a)(b)(4) [*sic*], which basically says that a racial

13

impact occurs if more people of a particular racial or ethnic group are arrested and charged with crimes."

Defense counsel's reference to section "745(a)(b)(4)" prompted discussion. The trial court left the bench to consult its copy of the Penal Code. When the court returned, the prosecutor clarified that defense counsel was relying on the provision in section 1385, subdivision (c), that "says, 'Application of the enhancement would result in a discriminatory racial impact, as described in [p]aragraph 4 of [s]ubdivision (a) of [s]ection 745." The prosecutor further explained the operative section of the RJA "for our purposes today" was section 745, subdivision (a)(4)(A), under which a violation was established if " 'a longer or [more] severe sentence was imposed on the defendant than was imposed on other similarly-situated individuals convicted of the same offense.' "

The trial court responded, "Correct. Yes. That's the way I understood it. And that's more or less the sense that I get from [defense counsel's] argument." The court told counsel: "I think . . . the focus should be on convictions versus arrests. And, also, that there's a disparity in the amount of time or punishment. [¶] . . . I think that in accordance with [section] 1385 and the change in the law, from a racial disparity standpoint, the [c]ourt's focus needs to be on is there a disparity . . . taking into account the defendant's race versus other similarly-situated individuals of a different race in the length of punishment that the defendant receives for individuals that are in his race."

Defense counsel agreed and stated, "[a]nd my statistics went into that." Counsel highlighted the additional statistics provided in Frazier's addendum to the sentencing memorandum showing a "comparison of prison sentences, sentences of probation and dismissals or rejections" among the various

14

cohorts, including that 68 percent of the Black defendants were sentenced to prison, compared to 58 percent of the White defendants. Counsel admitted "there's not that much difference between 58 percent and 68 percent," but argued "although the disparity of the percentages is not really much, [B]lack people seem to be sentenced to prison longer than [W]hite or Hispanic [people]. What jumps out is there's such a big pool of [B]lack people and so little of a pool of [W]hites and Hispanics that . . . common sense tells you that [B]lack people are sentenced longer . . . we can't say why [B]lack people are arrested more and sentenced longer, but the statistics show that they are."

The trial court expressed doubt whether "the legislature is necessarily asking [the court] to focus on the disparity in arrests versus . . . a difference in the punishment that courts are imposing." Defense counsel responded that the defense "statistics show that proportionally [B]lack people are sentenced a little bit more severely than [W]hite and Hispanic [people]." As for the relevance of the arrest statistics, counsel argued, "More [B]lack people in the community are arrested pertaining to . . . pandering, pimping, [and] human trafficking. I'm arguing the [B]lack community is affected by this law because more [B]lack people are arrested by it."

The trial court ultimately concluded it "should look at the disparity [in] arrests between [the Black] and [W]hite population in determining whether . . . the [d]efense has made [a] prima facie showing[,] and the [c]ourt should therefore consider this as a factor in dismissing the strike pursuant to [section] 1385." Defense counsel responded that Frazier's "statistics show that [B]lack people do go proportionally to prison more often than [W]hite and Hispanic [people]. Not by a great amount, but they do." He then turned to arguing the merits of the remaining mitigating circumstances the defense was relying on to strike the strike under section 1385. (See footnote 13, *ante*.)

15

The prosecutor argued Frazier had not made a prima facie showing of an RJA violation. The prosecutor emphasized the defense statistics relied on "straight pimping, straight pandering, . . . [and] straight human trafficking,"[17] whereas the People confined their analysis to cases where defendants were either charged or convicted of the same crimes as Frazier, namely human trafficking, pimping, or pandering of a minor, which were "the statistics that should be considered." Also, Frazier failed to discuss whether the individuals reflected in the statistics were similarly situated to him, such as by providing the facts of other cases or criminal histories of other defendants, or by otherwise giving individualized consideration "to any of these defendants as they relate to Mr. Frazier."

Turning to the other mitigating circumstances relied on by the defense, the prosecutor argued that even though Frazier's strike was more than five years old such that one of the mitigating circumstances existed (see § 1385, subd. (c)(2)(H)), the evidence Frazier continued pimping while in custody supported denying relief under subdivision (c)(2) based on a finding that "striking the enhancement in this case would endanger public safety."

In the end, the trial court declined to exercise its discretion under section 1385 to dismiss the strike allegation. Acknowledging that both sides

_____

17    The prosecutor was correct that Frazier's statistics included arrests, charges, and sentences for "straight pimping" and "straight pandering"—in other words, violations of sections 266h, subdivision (a), and 266i, subdivision (a)(1), which penalize pimping and pandering of "another person" without requiring the person to be a minor. However, Frazier's sentencing memorandum and addendum stated that the human trafficking crime addressed in his statistics was section 236.1, subdivision (c)(1), which is human trafficking of a minor, not "straight human trafficking" as the prosecutor claimed.

had spent "a considerable amount of time on the . . . [mitigating] factor[ ] that deals with racial disparity," the court explained why it did not believe the defense sufficiently demonstrated this factor. The court stated it was persuaded by the prosecution's argument that "even if you do have these numbers . . . you have to do a deeper dive in comparing apples to apples as far as offense to offense in determining whether there's a disparity in the sentence that a defendant receives . . . relative to conduct he or she engaged in." It therefore was not persuaded the defense "made a prima facie showing as to a racial disparity in sentencing, as given Mr. Frazier's race as [a Black] person versus other similarly situated [W]hites[.]"

The trial court went on to find that "one or more" other mitigating factors enumerated in subdivision (c)(2) of section 1385 were present. It denied relief, however, because it found that striking Frazier's strike "would result in . . . the public being in danger." The court stated the evidence that Frazier had continued pimping while in custody "show[ed] a dedication" to the human trafficking activities that resulted in his arrest and conviction, which it found to be "considerably concerning." After weighing aggravating and mitigating sentencing factors, the court declined to impose a low term sentence. It chose count 1 as the principal count and imposed a 16-year prison term on that count (the middle term of eight years, doubled due to the strike prior). Sentencing on counts 2 and 3 was stayed pursuant to section 654. Thus, Frazier's total custodial term was 16 years.

## DISCUSSION

### I.

### *The RJA*

The Legislature enacted the RJA in 2020 with an important goal, "to eliminate racial bias from California's criminal justice system" and "to ensure

17

that race plays no role at all in seeking or obtaining convictions or in sentencing." (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) (Assem. Bill 2542) § 2, subd. (i).) The Legislature found that " '[e]ven though racial bias is widely acknowledged as intolerable in our criminal justice system, it nevertheless persists because courts generally only address racial bias in its most extreme and blatant forms. . . . Even when racism clearly infects a criminal proceeding, under current legal precedent, proof of purposeful discrimination is often required, but nearly impossible to establish.' [Citation.] 'Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias. The intent of the Legislature is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system.' " (*Young*, *supra*, 79 Cal.App.5th at p. 149, quoting Assem. Bill 2542, § 2, subds. (c), (i); *Young*, at pp. 149–150 [discussing the uncodified legislative findings that accompanied passage of the RJA, which "provide an illuminating guide to the legislative objectives in passing the [RJA]"].)

As the *Young* court noted, the legislative findings express a concern that courts have not done enough to redress racial discrimination in the criminal justice system, and cite "various examples drawn from case law to illustrate what [the Legislature] perceives as judicial reticence in dealing with claimed race discrimination[.]" (*Young*, *supra*, 79 Cal.App.5th at p. 149.) The findings specifically call out the oft-criticized decision in *McCleskey v. Kemp* (1987) 481 U.S. 279—in which the United States Supreme Court declined to find any inference of racial discrimination in Georgia's criminal justice system from statistical evidence that " 'relentlessly document[ed]' " the risk that a defendant was 4.3 times more likely to receive

18

the death penalty if charged with killing White victims as opposed to Black victims —"as an emblem of perceived judicial indifference to racial bias." (*Young*, at pp. 150–152; *id.* at pp. 150–151 [discussing *McCleskey*].)  In enacting the RJA, our Legislature made clear "its intent to depart from the discriminatory purpose paradigm in federal equal protection law," as expressed by the majority in *McCleskey*, and to permit the use of statistical evidence to establish racial bias.  (*Young*, at pp. 150, 152–153.)

The RJA, which is codified in three interrelated statutes (§§ 745, 1473, subd. (f), 1473.7, subd. (a)(3)), provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin" (§ 745, subd. (a)).  "The [RJA] sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)."  (*Young*, *supra*, 79 Cal.App.5th at p. 147; see § 745, subd. (a)(1)–(4).)  Two of these categories—imposing charges or obtaining convictions on the basis of race (§ 745, subd. (a)(3)) and imposing longer or mere sentences on the basis of race (§ 745, subd. (a)(4))— are relevant to this appeal.

A defendant who alleges a violation of subdivision (a) of section 745 "may file a motion in the trial court[.]"  (§ 745, subd. (b).)  "Claimed violations of section 745, subdivision (a) may also be raised postjudgment, by petition for habeas corpus under section 1473, subdivision (f) or by motion to vacate an allegedly invalid conviction or sentence under section 1473.7."  (*Young*, *supra*, 79 Cal.App.5th at p. 148.)  If the defendant "makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing" at which "evidence may be presented by either party, including, but not limited to, statistical evidence, aggregate data, expert testimony, and the sworn testimony of witnesses."  (§ 745, subd. (c).)  " 'Prima facie

showing' means that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred." (§ 745, subd. (h)(2).) " '[S]ubstantial likelihood,' " in turn, means "more than a mere possibility, but less than a standard of more likely than not." (*Ibid.*)

The defendant bears the burden of proving a violation of subdivision (a) of section 745 by a preponderance of the evidence. (§ 745, subd. (c).) If a violation of section 745, subdivision (a), is proved by a preponderance of the evidence, "the court shall impose a remedy specific to the violation found from" a list of remedies set forth in subdivision (e) of section 745. Relevant here, the court may, "[i]f the court determines that it would be in the interest of justice, dismiss enhancements, special circumstances, or special allegations, or reduce one or more charges." (*Id.*, subd. (e)(1)(C).)

## II.

### *Frazier's Contentions on Appeal*

Frazier's essential contention on appeal is that the trial court erroneously failed to find an RJA violation under subdivision (a) of section 745. However, he presents the claimed violation to us differently than the manner in which he presented it to the trial court. In the trial court, Frazier sought to demonstrate an RJA violation as a basis for the court to strike his prior strike under subdivision (c)(2) of section 1385. As he made explicit in the addendum to his sentencing memorandum, "[t]he purpose of the statistics [he offered] was to evaluate the racial impact of the enforcement of the prostitution laws in accord with [section] 1385," which authorized the sentencing court to "look at the [r]acial [i]mpact of a law in deciding whether to dismiss a strike." To a lesser extent he relied on the asserted RJA violation as a basis for alternatively requesting that the trial court impose a low-term sentence.

20

Now, in his opening brief on appeal, Frazier states his RJA claim "is based directly on section 745 and *not* section 1385." (Italics added.) He explains that subdivision (c)(2) of section 1385 governs dismissal of enhancements, and prior strikes are not considered enhancements (which means the statute he relied on in the trial court as a basis for striking the strike did not actually authorize that relief). He contends the statistical information presented to the court was sufficient to establish a violation of subdivision (a)(3) and/or (a)(4)(A) of section 745. He argues he is entitled to a remand of his case so the trial court can "fashion a remedy for the violation" under subdivision (e) of section 745.

The People oppose Frazier's arguments on procedural and substantive grounds. Procedurally, they contend that Frazier, by detaching his claim from its original moorings in section 1385, is improperly seeking to raise a violation of section 745, subdivision (a), on appeal in the first instance. They maintain Frazier "cannot file a standalone [RJA] claim on direct appeal" because he did not file a motion pursuant to section 745, subdivision (b); rather, he filed sentencing memoranda in which he "referenced" section 745 as a basis for relief. Substantively, the People argue that Frazier's trial court filings failed to address whether the disparity reflected in his statistics involved similarly situated individuals. As a result, the trial court ruled correctly when it found Frazier failed to make a prima facie showing of the discriminatory acts proscribed by section 745, subdivision (a).

### III.

### *Procedural Objections*

We start by considering the parties' procedural arguments. Although in the trial court, the defense, prosecution, and the court all proceeded as though section 1385, subdivision (c), authorized the court to strike Frazier's

21

strike, on appeal the parties are now in agreement that in fact this provision grants no such authority. Since this point is undisputed and Frazier no longer relies on section 1385, subdivision (c), as the basis for striking his strike, we assume without deciding that the parties' interpretation of the statute is correct.

Frazier seeks to avoid this difficulty on appeal by recasting his RJA claim as one brought exclusively under section 745, which, as we have discussed, has its own remedial provision—subdivision (e). If the sentencing court finds an RJA violation, subdivision (e)(1)(C) authorizes it to "dismiss enhancements, special circumstances, or *special allegations*" if it is in the interest of justice to do so. (§ 745, subd. (e)(1)(C), italics added.) Frazier maintains that because the statistics before the trial court were sufficient to prove a violation of subdivision (a)(3) and/or (a)(4)(A) of section 745, we must remand his case so the trial court can fashion a remedy pursuant to subdivision (e) of section 745. Even though he did not invoke subdivision (e) of section 745 in the trial court, he indicates he now wishes to pursue a variety of remedies under subdivision (e), including dismissal of the charges against him as well as the strike allegation, and to request imposition of a low-term sentence.

The People's concern with this turnaround is understandable, and there is merit to some of their procedural arguments. As they point out, the plain language of section 745 does not appear to authorize a defendant to bring a section 745 claim on direct appeal in the first instance. Instead, persons alleging violations of subdivision (a) of section 745 are provided three options. They may file (1) a motion in the trial court prior to entry of judgment; (2) a postjudgment petition for writ of habeas corpus; or (3) a

postjudgment motion to vacate a conviction or sentence by a person no longer in custody under section 1473.7.  (§ 745, subd. (b).)

We also agree with the People that consideration of an RJA claim for the first time on appeal does not appear "compatible with the development and consideration of an RJA claim" as contemplated by section 745.  Under section 745, a defendant must "make[ ] a prima facie showing of a violation of subdivision (a)."  (§ 745, subd. (c).)  If he succeeds in doing so, the trial court must hold an evidentiary hearing.  (§ 745, subd. (c)(1).)  A first-time claim under section 745 would therefore be " 'dependent upon evidence and matters not reflected in the record on appeal,' " violating the rule that an appellate court's " 'review on direct appeal is limited to the appellate record.' "  (*People v. Jenkins* (2000) 22 Cal.4th 900, 952.)  We also observe that by seeking relief under subdivision (e) of section 745 on appeal when he did not do so in the trial court, Frazier violates the rule that a defendant's " ' " ' "failure to make [a] timely assertion of [a] right before a tribunal having jurisdiction to determine it" ' " ' " forfeits that right.  (*People v. Trujillo* (2015) 60 Cal.4th 850, 856.)

Notwithstanding the People's procedural objections, we elect to reach the merits of Frazier's appeal.  The California Supreme Court recently issued an order in a case on direct review granting the appellant permission to file a supplemental opening brief raising claims under the RJA, while reserving the question of whether such claims are cognizable on direct appeal.  (*People v. Colbert* (May 17, 2023, S169152) 2023 Cal.LEXIS 2611, *1.)  Thus, the procedural objection raised by the People will soon be decided by our Supreme Court.

Also, the People's concern about an appellate court's consideration of evidence in the first instance does not exist here.  Both sides presented their

23

statistical analyses to the trial court, which did consider whether the defense met its burden under section 745, subdivision (c), of making a prima facie showing of an RJA violation of subdivision (a)(4)(A).[18] The parties and the court extensively considered the merits of Frazier's RJA claim. Frazier's appeal relies entirely on the trial record and does not ask us to consider new facts or evidence. Thus his appeal presents a question of law with respect to the proof required to establish an RJA violation, "an important legal issue." (*In re Sheena K.* (2007) 40 Cal.4th 875, 888, fn. 7 ["an appellate court may consider a claim raising an important question of law despite" a forfeiture where the case " 'present[s] an important legal issue' "]; see *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [appellate court retains discretion to entertain forfeited legal issues].) Also, addressing the substantive issue raised by Frazier may forestall a claim of ineffective assistance of counsel. (See *People v. Lewis* (1990) 50 Cal.3d 262, 282 [considering merits of appellant's forfeited claims "to forestall an ineffectiveness of counsel contention" based on defense counsel's failure to preserve the claims for appeal by making a timely objection in the trial court].)

IV.

*Prima Facie Showing of an RJA Violation*

Frazier's current contention is that he succeeded in establishing an RJA violation at the sentencing hearing and is entitled to the remedies

---

[18] Although section 1385, subdivision (c)(2)(A), only incorporates subdivision (a)(4) of section 745 (which relates to racial discrimination in sentencing), Frazier's sentencing memorandum also relied on the text of subdivision (a)(3) of section 745 (relating to racial discrimination in charging decisions and convictions). Perhaps for this reason, the People do not contend this appeal is the first time Frazier has invoked subdivision (a)(3) of section 745.

afforded by subdivision (e) of section 745. As we have noted, the remedies under subdivision (e) are available only "if the court finds, by a preponderance of evidence" a violation of subdivision (a) of section 745. (§ 745, subd. (e).) Here, the trial court found Frazier did not succeed in making even a prima facie showing of a violation of subdivision (a), which is a less burdensome standard than the preponderance of the evidence standard required by subdivision (e). (See § 745, subd. (h)(2) [" 'Prima facie showing' " means "the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred"; " 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not"]; *Young*, *supra*, 79 Cal.App.5th at p. 160 [the RJA's requirement to prove a violation by a preponderance of the evidence is a "more demanding standard" than the requirement to make a " 'prima facie showing' " of a violation].) As we discuss, Frazier fails to show the court's prima facie ruling was erroneous. As a consequence, he fails to demonstrate that the factual record he developed in the trial court entitles him to a remand to pursue the remedies in subdivision (e).

We review de novo the trial court's determination that Frazier failed to make a prima facie showing of an RJA violation. (See, e.g., *People v. Scott* (2015) 61 Cal.4th 363, 384 [court reviewed de novo whether defendant had made a prima facie case of racial discrimination in use of peremptory challenges]; *People v. Ervin* (2021) 72 Cal.App.5th 90, 104 [whether defendant made a prima facie showing for relief under former § 1170.95 (now § 1172.6) reviewed de novo].) Although our review is independent, it is Frazier, as the appealing party, who bears the burden of affirmatively demonstrating error. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 ["Perhaps the most fundamental rule of appellate law is that the judgment

challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error."]; accord *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549.)

Frazier claims the trial court erred in its ruling because it refused to consider his arrest statistics when it evaluated his RJA claim. Citing *Young*, *supra*, 79 Cal.App.5th 138, he argues this was improper because statistics showing racial disparities in arrest rates are relevant to establishing racial bias in a charging decision or conviction in violation of section 745, subdivision (a)(3). This is so, he claims, because "a defendant is charged with or convicted of a more serious crime if he or she is charged with any crime at all and members of a different race are not charged at all." He contends arrest statistics may also be relied on to show racial bias in sentencing, a violation of subdivision (a)(4)(A), because "longer and more severe sentences are being imposed on the suspect group if they are sentenced for any crime, and the other races are simply not charged, convicted, or sentenced at all."

We reject Frazier's threshold assertion that the trial court refused to consider the defense statistics showing more Black people than non-Black people were arrested for human trafficking, pimping, or pandering crimes. The record simply does not support this view. Although the court initially questioned whether it could consider arrest statistics in determining whether Frazier had demonstrated racial disparity in sentencing under section 1385, subdivision (c)(2), after extensive discussion with counsel, the court stated it "*should* look at the disparity [in] arrests between the African[ ]American and [W]hite population in determining whether . . . the [d]efense has made [a] prima facie showing[,] and the [c]ourt *should* therefore consider this as a factor in dismissing the strike pursuant to [section] 1385." (Italics added.)

26

The court's statements bely Frazier's claim that it refused to consider his arrest statistics.

Next, as for Frazier's argument that arrest statistics like those he presented may be relevant to establishing a violation of subdivision (a)(3) or (a)(4)(A) of section 745, we do not disagree that this theory may have validity in some cases. The precise entry points when racial discrimination is introduced into a criminal proceeding may be difficult to isolate, and "the extended impact that any initial discrimination may have on later stages of the criminal process" even more difficult to identify. (*Developments in the Law: Race and the Criminal Process: IV. Race and the Prosecutor's Charging Decision* (1988) 101 Harv. L.Rev. 1520, 1524–1525 [discussing the difficulty of isolating the potential points at which racial discrimination enters the criminal process given the discretionary nature of prosecutorial charging decisions].) As the *Young* court explained, "evidence of racial bias in arrests may be potentially relevant to an allegation of racial bias in charging." (*Young*, *supra*, 79 Cal.App.5th at p. 164.) The problem with Frazier's argument is not the validity of the theory that a logical link may exist between arrests and charging or sentencing decisions, but the statistical analysis he offered. It simply fell short of satisfying the relevant statutory requirements.

At the time Frazier originally brought his RJA claim in 2022, to establish a violation under subdivision (a)(3) of section 745, the defendant was required to prove he or she "was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins *who commit similar offenses and are similarly situated*, <u>and</u> the evidence establishes that the prosecution *more frequently* sought or obtained convictions for more serious offenses against people who share the

27

defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained." (Italics and underscore added.) To establish a violation under subdivision (a)(4)(A) of section 745, the defendant must prove that "[a] longer or more severe sentence was imposed on the defendant than was imposed on *other similarly situated individuals convicted of the same offense*, and longer or more severe sentences were *more frequently* imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed." (Italics and underscore added.) Each provision thus requires proof the defendant was subjected to harsher penal consequences than other "similarly situated" individuals who committed similar offenses or were convicted of the same offenses, *and* that members of the defendant's race were "more frequently" subjected to harsher penal consequences than members of other races.

It was Frazier's showing as to the "similarly situated" requirement that the trial court found deficient. The court ruled that "given the information that was provided," Frazier failed to make "a prima facie showing as to a racial disparity in sentencing, as given . . . Frazier's race as an African[ ] American person versus other similarly situated [W]hites."[19] In his opening brief on appeal, Frazier acknowledges "[t]he trial court did not find a section

_____

[19] During the sentencing hearing it was made clear by the prosecutor and trial court, without objection from Frazier, that because Frazier was moving to dismiss his strike allegation under subdivision (c) of section 1385, his RJA claim was limited to a claim of racial discrimination in sentencing in violation of subdivision (a)(4) of section 745. Based on Frazier's failure to object to this framing of his RJA claim, the court quite reasonably did not consider whether Frazier established a prima facie claim of racial bias in a charging decision or conviction in violation of subdivision (a)(3) of section 745.

28

745 violation because [he] had not demonstrated that similarly situated [W]hites and African[ ]Americans were sentenced differently." Yet none of Frazier's appellate arguments address this critical factual deficiency.

Frazier tries to demonstrate error on appeal much as he did in the trial court:  by relying on the sheer disparities in the *arrest* rates among various racial groups represented in the parties' statistics.  He continues to emphasize that the defense statistics showed 254 Black people, but only 10 White people, were arrested for human trafficking, pimping, or pandering between 2012 and 2022, and that Black individuals constituted 91 percent of arrests for those offenses, "but only about six[ ] percent of the population [of] the San Diego County metropolitan area."  He argues these arrest statistics established a violation of subdivision (a)(3) or (a)(4)(A) of section 745 because "the staggering disparity between the arrest of African[ ] Americans for pimping related laws and other races suggests that imbalance perpetuates itself in the charging, convicting, and sentencing of these offenses."  But as defense counsel candidly acknowledged in the trial court, the defense could not "say why [B]lack people are arrested more," only that "the statistics show that they are."

The RJA, however, requires a showing that a defendant was subjected to harsher penal consequences than others "*who commit similar offenses and are similarly situated*" (§ 745, subd. (a)(3), italics added) or "*other similarly situated individuals convicted of the same offense*" (*id.*, subd. (a)(4)(A), italics added), not just that members of the defendant's race were "more frequently" subjected to harsher penal consequences than members of other races (*id.*, subd. (a)(3) and (a)(4)(A).)  This more focused comparison was missing from Frazier's statistical presentation.

Whereas Frazier was convicted of human trafficking, pimping, *and* pandering of a minor (§§ 236.1, subd. (c)(1), 266h, subds. (a), (b)(1), 266i, subds. (a)(1), (b)(1)), the comparison group he put forward included individuals arrested, charged, or convicted of straight pimping or straight pandering (§§ 236.1, subd. (c)(1), 266h, subd. (a), and 266i, subd. (a)(2)).  His selection of this broad comparison group did not consider that minors are a more vulnerable class of victims and the exploitation of minors for commercial sex trafficking is a different category of crimes.  Thus he failed to show the other defendants he included in his statistics had "commit[ted] similar offenses," as required by section 745, subdivision (a)(3), or had been "convicted of the same offense," as required by subdivision (a)(4)(A).  It follows that Frazier cannot show the individuals represented in his statistics were "similarly situated" to him as required by the RJA.  (§ 745, subd. (a)(3) and (a)(4)(A).)

Frazier maintains on appeal that "similarly situated" should not be interpreted to mean perfectly identical.  He complains that the trial court set too high a bar by requiring an "apples to apples" comparison.  In his reply brief on appeal, he asks us to rely on new subdivision (h)(6) of section 745, which became effective on January 1, 2023, after his opening brief was filed.  (See Stats. 2022, ch. 739, § 2.)  New subdivision (h)(6) of section 745 states: " 'Similarly situated' means that factors that are relevant in charging and sentencing are similar and do not require that all individuals in the comparison group are identical.  A defendant's conviction history may be a relevant factor to the severity of the charges, convictions, or sentences.  If it is a relevant factor and the defense produces evidence that the conviction history may have been impacted by racial profiling or historical patterns of racially biased policing, the court shall consider the evidence."

30

Frazier's arguments do not persuade us that the trial court erred. First, "apples to apples" is a colloquial phrase generally used to mean comparing things that are alike. The trial court's use of the phrase did not necessarily signal it was requiring Frazier to compare individuals whose crimes involved identical, as opposed to merely similar, facts. Second, on our independent review of Frazier's factual showing as to the "similarly situated" requirement, we find no error in the court's conclusion that it was deficient. Frazier's statistical presentation was devoid of information showing any degree of similarity existed between himself and the individuals included in his statistics. Even if we were to apply new subdivision (h)(6) of section 745, it would not assist him. New subdivision (h)(6) requires the RJA claimant to show "that factors that are relevant in charging and sentencing are similar." Frazier did not provide any information at all about factors "relevant in charging and sentencing" for any of the individuals whose criminal cases were reflected in his data.

Frazier also relies on the People's statistics, which he describes as showing that "African[ ]Americans made up 38 of the 47 total defendants sentenced for pimping related convictions."[20] We are not persuaded that this disparity establishes a prima facie violation of subdivision (a)(3) or (a)(4)(A)

---

[20]    Frazier also states that the population of White people in the "San Diego County metropolitan area" is "approximately 20 times greater than the population of African Americans." He claims "[t]his means that approximately 5,000 [W]hites would have to have been arrested for pimping related conduct during this 10-year period to have a rough equivalency of arrest between [W]hites and African[ ]Americans." However, he offers no record support for these assertions. (See *People v. Farnam* (2002) 28 Cal.4th 107, 137 [counsel's unsupported factual assertion cannot establish a prima facie showing].)

of section 745, either.  Neither the cited statistic nor any other aspect of the People's data addressed the offense conduct engaged in by the nine non-Black defendants or whether factors "relevant in charging or sentencing are similar" (§ 745, new subd. (h)(6)) among Frazier and the nine non-Black defendants.  The People's statistics therefore did not demonstrate that Frazier was "charged or convicted of a more serious offense than defendants of other races . . . who commit similar offenses and are similarly situated." (§ 745, subd. (a)(3).)  Second, that more Black people are sentenced for "pimping related convictions" does not establish a violation of subdivision (a)(4)(A) of section 745.  Instead, subdivision (a)(4)(A) is violated when "*longer or more severe* sentences [are] more frequently imposed for that offense on people that share the defendant's race . . . than on defendants of other races[.]"  (Italics added.)

Further, as the People observe, their statistics showed the 47 defendants charged received sentences that were similar.  Although Black defendants made up a majority of the convictions, their sentences ranged from probation to 10 years, and the average sentence was 4.3 years.  The four White defendants, by comparison, received sentences ranging from five to 12 years, with an average sentence of 8.08 years.[21]  One Filipino defendant received a five-year sentence, and one "[o]ther" defendant was sentenced to six years, four months in state prison.  The only racial group that received lighter sentences in the aggregate were the three Hispanic defendants, whose terms ranged from probation to 3 years in state prison.  The People's

---

[21]    The People did not state the average sentence for the White defendants in this group.  However, based on the specific sentences of 5 years, 6 years, 9 years and 4 months, and 12 years set forth in the People's table of data, the average would be 8.08 years.

statistics thus did not tend to show that longer or more severe sentences "were more frequently imposed for [the same] offense[s]" on Black people than on members of other racial groups as is required to establish a violation of subdivision (a)(4)(A) of section 745.

Finally, Frazier maintains the trial court "made the wrong factual finding" when it ruled he fell short of making a prima facie showing of a violation of the RJA. In his view, since the "prima facie language" appears in subdivision (c) of section 745 and establishes the threshold required to hold an evidentiary hearing, once the court held a hearing, "[t]he prima facie issue was moot." We disagree. The hearing at which the court considered Frazier's RJA claim was a sentencing hearing, not an evidentiary hearing. And although the statute entitles defendants to an evidentiary hearing if they make a prima facie showing of an RJA violation, it does not preclude a court from affording the parties a hearing on a lesser showing. That the court in this case entertained argument about the merits of Frazier's claim at the sentencing hearing does not compel the conclusion, to use Frazier's words, "[t]he prima facie issue was moot." In other words, no conflict arises from the court's decision to entertain argument at a hearing and its later finding that Frazier had not made a prima facie case showing of a violation of subdivision (a) of section 745.

In sum, because the statistics proffered to the trial court failed to address all the requirements of subdivision (a)(3) and (a)(4)(A) of section 745, the trial court did not err when it concluded Frazier had not made a prima facie showing of an RJA violation. For this reason, he is not entitled to a

remand to pursue the remedies for an RJA violation under subdivision (e) of section 745.[22]

V.

*Frazier's Due Process Rights Were Not Violated*

Citing *Hicks v. Oklahoma* (1980) 447 U.S. 343, 345, Frazier contends the trial court's "section 745 violation" deprived him of his right to due process of law. However, for the reasons we have already discussed, the court did not violate section 745. We agree with the People there was no statutory error under section 745, let alone error that "was 'so arbitrary or capricious as to constitute an independent due process' violation." (*Moore v. Chrones* (C.D. Cal. 2009) 687 F.Supp.2d 1005, 1041.)

---

[22]    Frazier's appellate claim that he is entitled to a remand of his case to pursue the remedies in subdivision (e)(1)(C) of section 745 suffers from an additional problem. These remedies become available only "[i]f the court determines that it would be in the interest of justice" to impose them. (§ 745, subd. (e)(1)(C).) The trial court found that Frazier had continued pimping while in custody, and it relied on this finding when it concluded that dismissing his strike would "endanger public safety" under section 1385, subdivision (c)(2). Frazier does not challenge the trial court's factual finding. He also does not argue that it is likely the same court that determined that reducing his sentence would endanger the public safety would conclude that it is "in the interest of justice" to grant him sentencing relief under subdivision (e)(1)(C) of section 745. Although Frazier's failure to establish that there exists a factual basis for concluding he meets the "interest of justice" requirement in subdivision (e)(1)(C) of section 745 serves as an additional reason for rejecting his appellate claim that he is entitled to a remand to pursue its remedies, we do not resolve the appeal on the basis of this omission since the parties have not addressed it in their appellate briefing.

34

## DISPOSITION

The judgment is affirmed.


                                                              DO, J.


WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.